IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Dawson Farms, | ) | |
| | ) | Case No. 3:09-cv-67 |
| Plaintiff, | ) | |
| | ) | **ORDER DENYING PLAINTIFF'S** |
| -vs- | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT AND GRANTING** |
| Risk Management Agency, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendant. | ) | |

## I. INTRODUCTION

Dawson Farms brings this action pursuant to 7 U.S.C. § 6999 and 5 U.S.C. § 701, et seq for judicial review of a final decision of the National Appeals Division. At issue is a dispute over crop insurance benefits that Dawson Farms claims are owed for losses sustained to its 2006 potato harvest. Having carefully considered the entire administrative record as well as the briefs and arguments of the parties, the Court now issues this memorandum opinion and order.

## II. SUMMARY OF DECISION

The Deputy Director applied the correct standard of review to the hearing officer's decision and did not improperly substitute his findings for those of the hearing officer. There is substantial evidence in the record to sustain the Deputy Director's decision, and under the deferential review required of a reviewing court, the Director's decision must be upheld. Lastly, Dawson Farms did not abandon or waive its claim regarding its request to re-sample; however, there is no duty to re-sample and thus the error by the Deputy Director has no legal effect on the decision.

### III. STATEMENT OF FACTS

Dawson Farms is a North Dakota partnership between Michael Sitzmann and Ronald D. Offut, which operates a commercial farm located in south central North Dakota. Certified Administrative Record 304 (hereafter "CR"). During the time relevant to this litigation, Sitzmann was the managing partner, overseeing the day to day operations of the farm, while Offut provided expertise in the areas of seed, agronomy services and many of the administrative duties related to the farm. CR 480. Dawson Farms primarily grows irrigated potatoes. Id.

Dawson Farms purchased a multi-peril crop insurance policy from Rain and Hail, LLC to cover the 2006 potato production. Rain and Hail, LLC is licensed and authorized to sell federally insured crop insurance policies in North Dakota. CR 304. The multi-peril crop insurance policy is reinsured by the Federal Crop Insurance Corporation ("FCIC") under the provisions of the Federal Crop Insurance Act, 7 U.S.C. § 1501 *et seq*. CR 478. The Risk Management Agency operates and manages the FCIC under the provisions of the Act. Id.

Currently, federally insured crop insurance is sold by approximately 16 private sector companies that both sell and service the policies they sell. Risk Management acts as a reinsurer of the policies. Id. As a condition of providing the reinsurance, the selling and servicing companies are required to notify the Risk Management Agency whenever a claim in excess of $500,000 is presented. Id. After Risk Management receives notice, it may participate in all aspects of the loss determination and adjustment. Id.

The Dawson Farms policy at issue in this case consists of:

(1) The Common Crop Insurance Policy, CR 358-375;

(2) Northern Potato Crop Provisions, CR 347-350;

(3) Northern Potato Crop Storage Coverage Endorsement, CR 354; and

(4) Special Provisions of Insurance 2006 and succeeding crop years, CR 344.

The issues before the Court revolve around the Northern Potato Crop Provisions and the Northern Potato Crop Storage Endorsement. The policies cover the potatoes against unavoidable losses caused by identified causes, including a loss arising out of "adverse weather conditions." CR 348 (Northern Potato Crop Provision ¶ 9). The insurance period for the policy in question generally ended on October 15, 2006 . Id. at ¶ 8. However, the Storage Endorsement acts to extend the period for 60 days beyond the end of the insurance period for any "potatoes . . . damaged within the insurance period other than freeze that later results in [a loss covered by the policy]." CR 354 (Northern Potato Crop Storage Coverage Endorsement ¶ 5).

Put in its simplest terms, the policy as it applies in this case provides coverage for a quality adjustment when the subject potatoes have suffered from damage incurred before the policy period expires or the potatoes suffer from "tuber rot that is evident at, or prior to the end of the insurance period; and a grade inspection is performed." CR 349 (Northern Potato Crop Provisions ¶ 11(2)(1-2)). "Tuber rot" is defined as "any soft, mushy, or leaky condition of potato tissue (soft rot or wet breakdown as defined in the United States Standards for Grades of Potatoes) including, but not limited to, breakdown caused by Southern Bacterial Wilt, Ring Rot, or Late Blight." CR 347 (Northern Potato Crop Provisions ¶ 1).

This case involves alleged tuber rot in potatoes harvested off an identified unit covered by the insurance policy, Unit 102. Unit 102 is also referred to as the "Moss Unit" or the "Moss field." CR 39. The Moss Unit is a single field consisting of 134.3 acres of irrigated potatoes in Kidder County, North Dakota. Id. Under the policy, the yield guarantee for the Moss Unit was

43,419 cwt which was calculated using a per acre guarantee of 32,330 pounds per acre. Id.

By all accounts, the potato harvest in 2006 in Kidder County started under somewhat favorable conditions, but by mid-September had taken a decided turn for the worse. CR 306. Cool, wet and rainy conditions predominated from September 17 through the time the Moss Unit was finally harvested – October 7 through 10, 2006 – at which time the potatoes were placed in storage. CR 307. While a killing frost occurred during the overnight between October 10-11, there is no question that the Moss Unit potatoes were undamaged by frost. Id.

The harvest itself was performed under brutal conditions. First, it was too hot. When the temperatures moderated, then the rains began to fall. Id. Whenever it was nearly dry enough to harvest the potatoes, more rain would fall. As conditions deteriorated, Sitzmann hired more laborers and equipment, ending up with a harvesting crew consisting of 30 field trucks and operators, 65-70 independent semi-trucks, and another 75 general farm laborers. Id. Harvesting equipment was frequently stuck and required other machinery to drag it through the fields. Id.

Despite the adversity, Dawson Farms was able to fully harvest the Moss Unit. Id. The field produced a total of 65,201.7 cwt, which substantially exceeded the insurance guaranty of 43,419 cwt. The potatoes were stored in the south bin of a Hansen-Rice storage facility owned and operated by Dawson Farms in Tappen, North Dakota. CR 307. This type of storage facility is recognized as one of the best storage systems available for controlling ventilation and moisture management in order "to reduce excess field health and moisture in potatoes." CR 308. The Northern Potato Crop Storage Coverage Endorsement covered the Moss Unit potatoes while in the Tappen warehouse.

On October 10, 2006, Dawson Farms filed a Notice of Loss with Rain and Hail, LLC for

damages arising out of excessive moisture, which is an "adverse weather condition" that is a covered loss under the policies. CR 348 (Northern Potato Crop Provisions ¶ 9). Rain and Hail, LLC notified the Risk Management Agency of a potential large loss claim (one involving more than $500,000 of exposure). CR 308. Rain and Hail, LLC made immediate arrangements for John Bata and Paul Hodny to adjust the claim and the adjusters made their fist visit to Dawson Farms the next day. Id.

Hodny and Bata made visits to inspect Dawson Farms' fields on the 11th and 16th of October – being joined in the October 16 meeting by Steve Axtman, a supervisor at Rain and Hail, LLC, and Gabriele Kelly, a representative of the Risk Management Agency. CR 308. At no time during these visits was any inspection made of potatoes harvested off the Moss Unit and stored in the Tappen warehouse. Id.

On December 5, 2006, John Bata returned to the Tappen warehouse to inspect and sample the stored potatoes. CR 309. The storage endorsement period expired on December 9, 2006, so time for inspection and sampling was short. CR 354. Bata visually examined the potatoes in the bin, and then collected a 56.31 pound sample of potatoes. CR 769. He explained his method of sampling as consisting of walking in a zig-zag pattern across the surface of the pile drawing potatoes from a depth of about six or eight inches below the surface. CR 493 (citing, Hearing 2, Track 2, 2:36:42 through 2:51:57).

While Bata made contact with Sitzmann prior to arriving at the Tappen warehouse for the sampling, the actual sampling was taken outside of Sitzmann's presence. CR 309. When Sitzmann arrived at the warehouse, a conversation took place in which Bata indicated that he believed the potatoes from the Moss Unit were in pretty good shape. Sitzmann disagreed, and

5

showed Bata potato juice streaming from the culverts under the pile. CR 309. A dispute exists between Sitzmann and Bata about the number of culverts with potato juice present. Bata testified that only one such culvert was shown to him (Hearing 2, Track 2, Bata Testimony 2:37:02 to 2:37:10); Sitzmann denies this observation and contends he asked for an additional sample. It is undisputed that Bata declined to re-sample. CR 309.

Bata delivered the sample to the potato inspection laboratory in East Grand Forks, Minnesota for disease diagnosis. The inspection resulted in a finding that tuber rot was present in the Moss Unit sample in a total amount of 3.52%. CR 769. The inspection also confirmed the sample was free from freeze damage. Id. No one disputes that if this testing is accurate, Dawson Farms has not sustained a compensable loss.

Sitzmann received the grading report and immediately contacted his insurance agent, James Percy. Sitzmann made both a telephone and a fax request that the potatoes be re-sampled. CR 310, 1236. On December 11, 2006, Percy faxed a memo to Rain and Hail, LLC telling them that Sitzmann "had just received the test samples on the stored potatoes from the Warehouse" and that Sitzmann had requested a re-sampling because he disputed the 3% tuber rot finding. CR 311 at FOF 34. The insurance company determined the request for re-sampling was outside the 60-day window and denied the request. Id. at FOF 35.

On May 11, 2007, the Risk Management Agency issued an indemnity determination that denied any loss on the Moss Unit potatoes. CR 7-8, 767. On June 4, 2007, Dawson Farms appealed the determination of the Risk Management Agency to the National Appeals Division of the United States Department of Agriculture (hereafter "NAD"). CR 18-24. Over a non-continuous six day period between September 4, 2007 and October 24, 2007, the NAD Hearing

Officer conducted an in-person hearing. CR 284-89. On March 14, 2008, the hearing officer found in favor of Dawson Farms and determined that the Risk Management Agency had erred in its adjustment on all six of the disputed units, including the Moss Unit. CR 301-27. The basis for the decision was that the adjusters did not correctly sample either the harvested or unharvested potatoes. CR 322.

On April 7, 2008, the Risk Management Agency requested a Director review. CR 329-42. Although the Risk Management Agency admitted there were problems with some of the units tested, they continued to assert that the Moss Unit had been properly sampled and that the hearing officer's decision relating to it should be reversed. CR 340. On June 27, 2008, the NAD issued a Director's Review Determination that affirmed the hearing officer on all units except the Moss Unit. CR 477-94. The Director reversed the decision of the hearing officer as it related to the Moss Unit on the basis that there had been no error in sampling the south bin in the Tappen Warehouse.

Dawson Farms sought reconsideration of the Director's Review Determination, which was denied. CR 497-99. Dawson Farms commenced this action on July 23, 2009. Doc. #1. Defendants answered. Docs. #9 & #13.[1] The case is now before the court on competing motions for summary judgment. Docs. #34 & #36.

### IV. ISSUES PRESENTED

Although the parties disagree on many particulars, the issues presented are relatively straight forward:

---

[1]The Complaint named Risk Management Agency and Rain and Hail, LLC as defendants. The parties stipulated to the dismissal of Rain and Hail, LLC (Doc. #23). The Court adopted the stipulation and dismissed Rain and Hail, LLC from this action (Doc. #24).

(1) Did the NAD Deputy Director apply the wrong standard of review when reviewing the hearing officer's determination that the Moss Unit potatoes were not properly sampled and thus rendering the determination of the Director arbitrary, capricious, and an abuse of discretion for failing to observe the procedure required by law?

(2) If not, is there substantial evidence in the record to sustain the Director's conclusion that the Moss Unit potatoes were properly sampled?

(3) And finally, did the Director act arbitrarily, capriciously, or abuse his discretion in determining that Dawson Farms had abandoned or waived its claim that the denial of its request for re-sampling was arbitrary, capricious and an abuse of discretion?

### V. Standard of Review

Section 6999 of Title 7, of the United States Code, provides: "a final determination of the National Appeals Division shall be reviewable and enforceable by any United States District Court of competent jurisdiction." 7 U.S.C. § 6999. The Administrative Procedures Act governs claims made against the Federal Crop Insurance Corporation and its managing entity, the Risk Management Agency. Stewart v. Federal Crop Ins. Corp., No. 4:09-cv-101, 2010 WL 3341863 (E.D. Tenn. Aug. 25, 2010); McElmurray v. U.S. Dept. of Agriculture, 535 F. Supp.2d 1318, 1324 (S.D. Ga. 2008).

Under the Administrative Procedures Act, the standard of review is whether the action of the agency is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law;" 5 U.S.C. § 706(2)(A), or, whether the decision is "without observance of procedure required by law", 5 U.S.C. § 706(2)(D), or, whether the decision is "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E).

A court reviewing an agency decision should not interfere with the decision unless it is

arbitrary, capricious, an abuse of discretion, not in accord with the law, or unsupported by the evidence. Even so, the reviewing court is not free to conjure up a reasoned basis for the agency decision that has not been offered by the agency itself. Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43 (1983). The standard imposed on the reviewing court is not a strenuous one – an agency action is to be invalidated only if it is not rational, or is not based on a consideration of relevant factors. F.C.C. v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 803 (1978). In reaching its decision, the district court must be searching and careful, but it is not empowered to substitute its judgment for that of the agency. Minnesota Milk Producers Ass'n v. Glickman, 153 F.3d 632, 641-42 (8th Cir. 1998).

Equally as narrow is the standard of review under the substantial evidence test. A reviewing court must uphold the agency's decision if it is supported by "substantial evidence." Cox v. U.S. Dept. of Agriculture, 925 F.2d 1102, 1104 (8th Cir. 1991). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Valkering, USA, Inc. v. U.S. Dept. of Agriculture, 48 F.3d 305, 307 (8th Cir. 1995) (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).

The court must also give deference to the agency's interpretation of its rules and regulations as long as that interpretation is not "plainly erroneous" or "inconsistent with the regulation." Thomas Jefferson University v. Shalala, 512 U.S. 512 (1994). The more technical and complex the regulatory area is, the more the courts defer to the expertise of the agency as a matter of public policy. Id. The agency need not adopt the most natural or most reasonable interpretation, all that is required is that the interpretation be a reasonable one. Chalenor v.

9

University of North Dakota, 291 F.3d 1042,1045 (8th Cir. 2002) (citing Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991)).

## VI. ANALYSIS

The analysis of this case turns on four separate questions: (1) Did the NAD follow its own procedures and apply the right standard of review in reaching its determination; (2) If so, is there substantial evidence in the record to sustain its determination; (3) If so, did Dawson Farms waive any claim arising out of the Risk Management Agencies refusal to re-sample the Moss Unit potatoes; and (4) If Dawson Farms did not abandon or waive its claim, does liability lie for a failure to re-sample – or put another way, did the Risk Management Agency have any duty to re-sample.

### A. **The Deputy Director applied the correct standard of review in the National Appeals Division Director's Review.**

Dawson Farms asserts the Deputy Director acted arbitrarily, capriciously, and abused his discretion or otherwise erred as a matter of law because he reviewed the decision of the hearing officer *de novo*. Essentially, Dawson Farms contends the Deputy Director substituted his findings of fact for those actually found by the hearing officer. The Risk Management Agency contends that the question resolved was one of law, not fact.

The National Appeals Division Guide establishes the scope of the review applicable in this case. Section 4, Director Review, Part II (B) provides in relevant part:

> **B.** **Standard of Review. 7 C.F.R. §§11.9(d) and 11.10.** The standard of review is whether substantial evidence supports the findings of fact made in the Hearing Officer's appeal determination. While findings of fact will not be disturbed unless contradicted by the record, no such deference is given to the conclusions and

determination.

www.nad.usda.gov/hearing_guide.html

At the hearing officer level, evidence was presented by a number of persons. Dawson Farms relied heavily on the grading performed on the potatoes by Simplot, the contracted buyer of the Moss Unit potatoes, and on the testimony of Dr. Gary Secor, who opined that the percentage of tuber rot was 20 to 25 percent based on the descriptions of witnesses other than the adjusters, photographs, and the sales records. In support of its loss adjustment, the Risk Management Agency relied mostly on the testimony of its grading lab supervisor Michael Horken and the insurance adjuster John Bata.

The hearing officer weighed the evidence and made findings of fact. CR 309, see FOF 25. Applying the findings of fact to the law, the hearing officer concluded there were two problems with the sampling: (1) the adjuster should have waited to sample the Moss Unit potatoes until Sitzmann was present; and (2) the refusal to obtain additional samples from the Moss Unit after Sitzmann expressed surprise at Bata's characterization of the potatoes and made a request of Bata to perform additional sampling on December 5, 2006, was error. CR 319. Relying on the potato grading from Simplot, the hearing officer also concluded that the large variance between the samples "raises the question about whether the Insurance Adjusters obtained a representative sample" of the Moss Unit potatoes. CR 320. The hearing officer concluded that Bata did not correctly sample the Moss Unit potatoes. CR 322. It is worthy of note that the hearing officer stated in support of his conclusion:

> I believe this is where we can inject a little common sense to this case. Since the adjusters were already at Appellant's Warehouse when Partner 1 advised them of the problems with the potatoes in the south half of the Warehouse,

the adjusters should have resampled the potatoes. Thus, the Insurance
Adjusters erred in not resampling Appellants potatoes on December 5, 20116
(57th day of coverage).

CR 319.

On review, the Deputy Director acknowledged that Bata had a duty to take a representative sample of the Moss Unit potatoes. He determined that Bata's sampling had met that duty. CR 493. The Deputy Director discounted Dr. Secor's testimony on the basis of a lack of first-hand knowledge of the condition of the potatoes, as compared to Bata's opportunity to examine and sample the potatoes. Id.

Dawson Farms asserts that these determinations by the Deputy Director constitute a re-weighing of the evidence and substitution of the Deputy Director's facts for those of the hearing officer's. As such, it contends the fact findings of the hearing officer should prevail, unless they are shown to be contradicted by evidence in the record. See 7 C.F.R. §§11.9(d) and 11.10.

A close reading of the hearing officer's opinion reveals that he never actually made a fact finding that the insurance adjuster failed to make a proper sampling of the Moss Unit storage bin. Instead, he stated that one needs to apply a "little common sense" in reaching a conclusion that the adjusters should have re-sampled the potatoes. This duty to re-sample under the circumstances present in the case is not a finding of fact – it is a conclusion of law – and a subjective one at that. The hearing officer never pointed to any rule or regulation that compelled his determination, instead he made plain that his conclusion was consistent with his "common sense." The Director is not bound by a decision that held the insurance adjuster to a standard of the hearing officer's own creation.

A reading of the Risk Management Loss Adjustment Manual reveals no requirement that

any specific method of sampling be followed to obtain a representative sample. Instead, it simply requires that the adjuster take enough samples to "ensure that the combined samples will be representative of all production in the storage structure." CR 455-56. The hearing officer made no finding of fact that the sampling done by Bata was inadequate, he simply determined that there should have been an additional sample taken in response to Sitzmann's objection. CR 319. The Deputy Director was free to decline to accept this conclusion of law, as it appears to have arisen solely in the hearing officer's common sense. Id.

The interpretation of rules and regulation in technical areas are entitled to deference and should be accepted if the interpretation is a reasonable one – even if it is not the most reasonable interpretation possible. Chalenor, 291 F.3d at 1045 (citing Pauley, 501 U.S. at 702). While common sense and prudence might well have suggested that Bata should have taken additional samples, it is reasonable on this record for the Deputy Director to conclude that the sampling was representative and sufficient. The Deputy Director applied the correct standard of review.

**B. There is substantial evidence in the record to sustain the Deputy Director's determination that the Moss Unit potatoes claim should be denied.**

Much of the analysis of this issue is consistent with the discussion thus far. It is plain that Dawson Farms produced evidence that would support its contention that the determination of the Director was arbitrary and capricious. Nonetheless, the standard of review applied to determinations of the Director is deferential, and his findings are to be affirmed by a reviewing court if supported by substantial evidence in the record as a whole. Minnesota Milk Producers Ass'n, 153 F.3d at 641-52. Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the agency's decision. Sultan v. Barnhart, 368 F.3d 857, 862 (8th Cir. 2004).

In order to determine whether evidence is substantial, a court considers evidence that detracts from the director's decision as well as the evidence that supports it. Id. at 863. The agency's decision is not subject to reversal simply because the reviewing court would have reached a different conclusion or because substantial evidence also exists which would support a contrary outcome. Id. If after review, the reviewing court is capable of drawing two inconsistent positions and one of those positions represents the agency's findings, the decision must be affirmed. Syverson v. U.S. Dept. of Agriculture, 601 F.3d 793, 800 (8th Cir. 2010). In the end, the Director's determination must be affirmed if there is such evidence in the record that a reasonable mind would find it adequate to support the agency's decision.

In reviewing the evidence for substantiality, it is significant to note that the potato crop on the Moss Unit yielded a gross hundredweight of 65,201.7, which was well in excess of the policy yield guaranty of 43,419 hundredweight. It would follow that a large percentage of covered damage would need to be present to result in a compensable claim. The Court has made a searching review of the entire record of the proceedings before the hearing officer and the Deputy Director, and on this record it appears a reasonable mind would find it adequate to support the agency's decision – particularly in light of the substantial loss that would be required to fall below the policy yield guaranty. Substantial evidence exists in the record to sustain the Deputy Director's determination that the claim on the Moss Unit potatoes should be denied.

  C. **While Dawson Farms did not abandon or waive its claim that the Risk Management Agency refused to re-sample, there is no duty to re-sample upon request and thus no reversible error.**

Dawson Farms correctly contends that waiver or abandonment should not be presumed from an inartfully worded argument; rather, the waiver must be knowingly and voluntarily made.

While it is possible to argue that a failure to preserve the issue is a waiver, in this case it appears that counsel was simply arguing, albeit a bit unclearly, that the Director would never have to get to the issue of re-sampling because the hearing officer should have been affirmed on the issue of inadequate sampling. CR 467. Under these circumstances, the finding of a waiver is arbitrary and improper.

Unfortunately for Dawson Farms, even though preserved, the issue is without merit. The Court has been completely unable to find any authority for the proposition that once an adequate sampling has been obtained by the Risk Management Agency, it is under a duty to resample upon request. While such a policy authorizing re-sampling might be reasonable, the agency need not adopt the most reasonable interpretation of its policy. Instead, the interpretation should be affirmed if supported by reason. Chalenor, 291 F. 3d at 1045. The Director has advanced possible pitfalls for allowing re-sampling upon request by the insured and those possible problems seem realistic enough to the Court to sustain the Agency's interpretations of its rules. Under the facts present in this case, there was no duty to re-sample.

## VII. Conclusion

For the foregoing reasons, the Director's Review Determination denying Dawson Farms' loss claim for the Moss Unit potatoes is affirmed. The agency's decision was supported by substantial evidence and under the required deferential court review must be upheld. While the Director erred in determining Dawson Farms abandoned or waived its claim regarding its request for a re-sampling, there is no duty to re-sample and thus no reversible error.

Accordingly, Dawson Farms' motion for summary judgment is **DENIED**, and Risk Management Agency's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 31st day of August, 2011.

                                              /s/ Ralph R. Erickson
                                              Ralph R. Erickson, Chief Judge
                                              United States District Court